Receipt number 9998-4373086

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

Dec 18 2017

U.S. COURT OF
FEDERAL CLAIMS

THE BOEING COMPANY,

                    Plaintiff,

          v.                                          Civil Action No. ____17-1969 C

UNITED STATES OF AMERICA,

                    Defendant.

## COMPLAINT

Plaintiff, The Boeing Company ("Boeing"), files this complaint by and through the undersigned attorneys against the United States. Boeing seeks constitutional, contractual, and declaratory relief and damages for the Government's assessment of a $1,064,773 price adjustment on one of Boeing's government contracts, No. N00019-09-C-0019, based on changes that one of Boeing's business units made in its cost accounting practices in 2011. That assessment violates Boeing's contractual rights or, alternatively, constitutes an illegal government exaction. Boeing hereby alleges as follows:

## INTRODUCTION

1.     This case concerns a particular accounting convention used when defense contracts are subject to the Cost Accounting Standards Statute, 41 U.S.C. §§ 1501-06 ("CAS Statute"), and include the Cost Accounting Standards Clause, 48 C.F.R. § 9903.201-4. The accounting convention, known as "offsetting," complies with—indeed *it is compelled by*—the CAS Statute. The convention has been endorsed by each and every Government entity having any interest in this case, including the Cost Accounting Standards Board ("CAS Board"), the body responsible for promulgating regulations interpreting the CAS Statute. For decades, it was

1

practiced by the defense industrial base and accepted without question by the Government. Even now, this accounting convention would remain unremarkable and uncontroversial, were it not for the Federal Acquisition Regulatory Council ("FAR Council"), which has suddenly developed a contrary position. Only the CAS Board, not the FAR Council, is authorized to promulgate binding regulations concerning offsetting. But in 2005, when the FAR Council revised the Federal Acquisition Regulation ("FAR"), it amended FAR 30.606 in order to prohibit offsetting. Boeing here challenges the Government's application of FAR 30.606 to Boeing.

2.      On January 1, 2011, Boeing implemented eight unilateral changes in the cost accounting practices it was using on certain of its contracts subject to the Cost Accounting Standards ("CAS-covered" contracts), as permitted by the CAS Statute and CAS Board regulations. A "cost accounting practice," as defined by the CAS Board, is "any disclosed or established accounting method or technique which is used for allocation of cost to cost objectives, assignment of cost to cost accounting periods, or measurement of cost." 48 C.F.R. § 9903.302-1. A "change" to a cost accounting practice "means any alteration in a cost accounting practice," *id.* § 9903.302-2, including a "unilateral change," which is a change "from one compliant practice to another compliant practice that a contractor with a CAS-covered contract(s) elects to make," *id.* § 9903.201-6(b)(2). Boeing's eight changes took effect simultaneously. There is no dispute that in effecting these changes, Boeing complied with the CAS Statute and CAS Board regulations permitting such unilateral, simultaneous changes.

3.      At once, Boeing's eight unilateral changes redistributed costs that had been anticipated by Boeing and the Government pursuant to Boeing's cost accounting practices as they had been before January 1, 2011. For example, before January 1, 2011, certain costs incurred by Boeing for employee labor were being consolidated into a single "bulk" pool, then

allocated for reimbursement across a base of multiple contracts. These employees performed shipping, packing, and crating services in support of multiple CAS-covered contracts. After January 1, 2011, because of an enhancement made to Boeing's system for shipping materials, Boeing began charging these employees' labor, with greater accuracy, as a *discrete* cost on the specific contracts supported by the employees. This was one of Boeing's eight changes, and Boeing calculated that the application of this new cost accounting practice would save the Government nearly $2 million.

4.      Cumulatively, Boeing's eight simultaneous accounting changes had the effect of *reducing* costs to be paid by the Government by $1,489,000. To be sure, the eight changes, considered individually, had mixed effects on the composition of Boeing's pool of costs on its CAS-covered contracts. On their own, two of the changes had the effect of increasing costs. But there is no dispute that any increased costs caused by some changes were more than cancelled out by the other, simultaneous changes, which together resulted in a net benefit to the Government of $1,489,000 in reduced costs.

5.      Boeing's CAS-covered contracts incorporated a version of the Cost Accounting Standards Clause, which imposes a process by which a contractor, having effected a unilateral change in its cost accounting practices, may be required to agree to an equitable adjustment of the price of CAS-covered contracts. 48 C.F.R. § 9903.201-4. The term "equitable adjustment" refers to the legal concept of adjusting the negotiated prices of CAS-covered contracts in order to return the parties to the same relative positions they occupied before implementing a change, preserving to each as nearly as possible the advantages and disadvantages of their original bargain. In general, subject to any governing statutory restrictions, entitlement to an equitable

adjustment depends upon an increase or decrease in cost as a result of a change; in other words, if there is no cost increase or decrease, no equitable adjustment is made.

6.     In the case of simultaneous, unilateral changes in cost accounting practices, the accounting convention known as "offsetting" has been applied routinely for decades, recognizing the principle that an equitable adjustment should be based on the changes' cumulative, bottom-line impact on the Government. If the sum of cost "decreases" exceeds or equals the sum of cost "increases," then the changes result in no harm to the Government, and no equitable adjustment is required. Conversely, to the extent that cost increases exceed decreases, an equitable adjustment in favor of the Government, calculated by the net difference between the cost increases and the cost decreases, is required. Use of this convention began in the 1970s, rooted in the first cost accounting standards statute passed by Congress, *see* Defense Production Act of 1950, Pub. L. No. 91-379, 84 Stat. 796 (1970), codified at 50 U.S.C. app. § 2168 (the "1970 DPA Amendment"), and in the standards and regulations promulgated by the original CAS Board. Offsetting is mandated even more clearly by the CAS Statute, which Congress passed in 1988. *See* Office of Federal Procurement Policy Amendments Act of 1988, *see* Pub. L. No. 100-679, § 5, 102 Stat. 4055 (1988).

7.     Here, the parties dispute whether offsetting should be used for the simultaneous, unilateral changes in cost accounting practices made by Boeing on January 1, 2011. As noted above, using the offsetting convention, the cumulative impact of the changes benefitted the Government, decreasing costs to the Government by $1,489,000. Boeing's position is that the Government reaps the benefit of this $1,489,000 in reduced costs, but that the Government is not entitled to an additional windfall in the form of an equitable adjustment to the price of Boeing's CAS-covered contracts merely because two individual changes, in isolation, resulted in increased

costs. In other words, Boeing maintains that, because the Government suffered no harm, the Government should not be permitted to extract further remuneration from Boeing. But the Government disagrees. On December 21, 2016, the Government issued to Boeing a Contracting Officer's Final Decision, demanding—on top of the $1,489,000 it already saved—an additional $940,007, plus interest, in the form of an equitable adjustment to Boeing's CAS-covered contracts on account of the two individual changes that, in isolation, resulted in increased costs. The Government claims that it is entitled to this equitable adjustment as additional compensation based on FAR 30.606 (as revised by the FAR Council in 2005), notwithstanding the simultaneous, offsetting impacts of the changes that decreased costs to the Government.

8.     The Government's position is wrong for three reasons. First, FAR 30.606 violates the CAS Statute, which compels the use of offsetting. The CAS Statute dictates that the amount of a price adjustment resulting from changed cost accounting practices must be sufficient "to protect the Federal Government from payment, *in the aggregate*, of increased costs, as defined by the Cost Accounting Standards Board." 41 U.S.C. § 1503(b) (emphasis added). In addition, the Statute requires that a price adjustment must not be so high that the Government would "recover costs *greater than the aggregate* increased cost to the Federal Government, as defined by the Board." *Id.* (emphasis added). Offsetting not only protects the Government "from payment, in the aggregate, of increased costs," but it also prevents the Government from "recover[ing] costs greater than the aggregate increased cost," as required by the CAS Statute. The very purpose of this statutory language is to prevent a windfall of the sort that the Government now is seeking, in the form of an additional payment from Boeing. *E.g.*, *DIRECTV Grp., Inc. v. United States*, 670 F.3d 1370, 1378 (Fed. Cir. 2012) (stating that U.S. Court of Federal Claims "correctly held that such a windfall is prohibited by the CAS statute").

9.     Second, the FAR Council lacked the authority to prohibit offsetting, which renders its revisions to FAR 30.606 unenforceable. The CAS Statute delegates to the Cost Accounting Standards Board—not the FAR Council—the exclusive authority to define the "aggregate increased costs" that the Statute authorizes the Government to recover. 41 U.S.C. § 1503(b). Moreover, the CAS Board has "exclusive authority" to promulgate the standards and rules necessary to obtain "uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the Federal Government." 41 U.S.C. § 1502(a)(1). In revising FAR 30.606 in 2005 to permit a windfall to the Government, the FAR Council flouted this statutory allocation of authority.

10.     Third, even if the FAR Council had the authority to prohibit offsetting (which Boeing does not concede), the 2005 revision to FAR 30.606 nevertheless is unenforceable because it was promulgated without the "notice and comment" period required by law. *See* 41 U.S.C. § 1707. For decades, offsetting had been practiced by the defense industrial base and prescribed by the Government, including the Government bodies that are party to or have an interest in this case, like the FAR Council. Indeed, in 2000, the FAR Council proposed a rule that would have formally acknowledged offsetting. *See* Federal Acquisition Regulation, 65 Fed. Reg. 20,854, 20,859 (Apr. 18, 2000) (proposed rule). In 2003, the FAR Council proposed a similar rule. *See* Federal Acquisition Regulation, 68 Fed. Reg. 40,104, 40,111 (July 3, 2003) (proposed rule). But in 2005, without first apprising the public of its intentions, the FAR Council reversed course—a reversal that the FAR Council wholly failed to explain or justify. For this reason, as well, the FAR Council acted without authority, and its prohibition of offsetting is unenforceable.

11.     Here, under Boeing's affected CAS-covered contracts and pursuant to the proper and longstanding interpretation of the CAS Statute, Boeing is entitled to offset any accounting

changes decreasing costs against any simultaneous changes increasing costs. Boeing requests a judgment that the Government, by imposing on Boeing an illegal, unenforceable prohibition of offsetting, has breached the subject contract, No. N00019-09-C-0019, and Boeing's other affected, CAS-covered contracts. Boeing also requests a judgment declaring that its contracts with the Government require the Government to offset the cost impacts of simultaneous unilateral changes in cost accounting practices, or, in the alternative, reforming Boeing's contracts to include express terms requiring offsetting. Last, and also in the alternative, Boeing requests a judgment that as the consequence of the Government's unlawful promulgation and application of FAR 30.606, its demand that Boeing pay $940,007, plus interest, and its receipt of installment payments made by Boeing against the claim asserted by the Government, the Government has effected an illegal exaction, depriving Boeing of its property without due process of law within the meaning of the Fifth Amendment to the United States Constitution. Boeing is entitled to damages sufficient to compensate it for the $71,276 in payments it has made to date pursuant to the 2016 COFD, plus the amount of each subsequent monthly payment of $8,900 that Boeing makes until this dispute is resolved, plus the interest that accrues on this claim until the date of payment by the Government under 41 U.S.C. § 7109.

### JURISDICTION

12.     This Court has subject matter jurisdiction over this case because it requests a judgment upon a claim by a contractor arising under 41 U.S.C. § 7104(b)(1). 28 U.S.C. § 1491(a)(2). In the alternative, this Court has subject matter jurisdiction under 28 U.S.C. § 1491(a)(1).

13.     Pursuant to 41 U.S.C. § 7103(a)(1), Boeing first submitted the claims alleged in this complaint to the Contracting Officer with authority over the contracts in question. On November 21, 2017, the Contracting Officer issued a written decision denying those claims. *See*

Exhibit 1 (November 21, 2017 Response to Request for Contracting Officer's Final Decision) (the "2017 COFD"). That decision constitutes a Contracting Officer's Final Decision under 41 U.S.C. § 7103. In the alternative, the Government's failure to issue a Contracting Officer's Final Decision within sixty days of receipt of Boeing's certified claim would constitute a deemed denial of the claim under Section 7103(f)(5). Pursuant to 41 U.S.C. § 7104(b)(3), Boeing is filing this action within 12 months of the 2017 COFD.

14.     Boeing also is challenging a contracting officer's final decision dated December 21, 2016. *See* Exhibit 2 (Contracting Officer's Final Decision and Demand for Payment of Debt Regarding Contractor Fiscal Year 2011 Boeing Defense, Space & Security – Fixed Wing Unilateral Accounting Changes effective January 1, 2011 (Dec. 21, 2016)) (the "2016 COFD"). Pursuant to 41 U.S.C. § 7104(b)(3), Boeing is filing this action within 12 months of the 2016 COFD.

## PARTIES

15.     The plaintiff in this action is The Boeing Company. Boeing is a Delaware corporation, headquartered in Chicago, Illinois. This case concerns accounting changes made by Boeing Defense, Space & Security ("BDS"), which is a unit of Boeing. BDS's mailing address is P.O. Box 516, St. Louis, Missouri 63166.

16.     Boeing is organized into several different business segments (also called Accounting Business Units). In 2011, one of these business segments, Boeing Defense, Space & Security—Fixed Wing ("Fixed Wing"), operated within Boeing's BDS division.

17.     Fixed Wing operated out of facilities primarily located in St. Louis, Missouri. It employed approximately 7,000 people, and its primary customer was the U.S. Department of Defense. Fixed Wing manufactured and sold numerous military aircraft, including the F-15 Eagle, the F/A-18 Hornet and F/A-18E/F Super Hornet, and C-17 Globemaster subassemblies. It

also provided engineering services related to those aircraft, including upgrades, technical support, and research and development activities. Its sales in 2011 were about $7.1 billion. As part of these operations, Boeing entered into hundreds of contracts with the United States, including the subject contract, No. N00019-09-C-0019, and other CAS-covered contracts. These contracts were executed on varying dates, from 1992 to 2015, at which time Fixed Wing was consolidated with a different business segment.

18.     The defendant in this action is the United States of America. The actions at issue in this lawsuit were performed by the Department of Defense's Defense Contract Management Agency ("DCMA"), acting through the Divisional Administrative Contracting Officer with authority over Contract No. N00019-09-C-0019. The DCMA is the federal agency responsible for administering contracts between contractors in the defense industrial base and the Department of Defense. DCMA's headquarters are at 3901 A Avenue, Building 10500, Fort Lee, VA 23801.

## FACTUAL ALLEGATIONS

### The Original CAS Board and Its Authority

19.     Congress created the original CAS Board in 1970, when it passed the 1970 DPA Amendment. *See* 1970 DPA Amendment. Its creation followed a feasibility study by the Comptroller General, which had concluded that it would be possible to achieve greater uniformity and consistency in the cost accounting practices used by defense contractors and subcontractors. *See* REPORT ON THE FEASIBILITY OF APPLYING UNIFORM COST ACCOUNTING STANDARDS TO NEGOTIATED DEFENSE CONTRACTS (1970). Congress had directed the study in response to complaints that a lack of uniform cost accounting procedures was limiting the Department of Defense's ability to determine its contractors' costs and profits.

20.     In the 1970 DPA Amendment, Congress enumerated specific and exclusive

powers of the original CAS Board, and it set forth guidance for the application and

administration of cost accounting standards and regulations to the defense industrial base.

21.     For example, Congress directed as follows: "The Board shall from time to time

promulgate cost-accounting standards designed to achieve uniformity and consistency in the

cost-accounting principles followed by defense contractors and subcontractors under Federal

contracts." 1970 DPA Amendment, § 103, Sec. 719(g).

22.     Congress also directed: "The Board is authorized to make, promulgate, amend,

and rescind rules and regulations for the implementation of cost accounting standards . . . ." *Id.*

§ 103, Sec. 719(h)(1).

23.     Congress further directed:

> Such regulations shall require defense contractors and subcontractors as a
> condition of contracting . . . to agree to a contract price adjustment, with
> interest, for any increased costs paid to the defense contractor by the United
> States because of the defense contractor's failure to comply with duly
> promulgated cost-accounting standards or to follow consistently his
> disclosed cost-accounting practices in pricing contract proposals and in
> accumulating and reporting contract performance data.

*Id.*

24.     From the outset, the constituents of the original CAS Board included a

representative from the defense industrial base, ensuring that the defense industry would not be

excluded from the development and implementation of the cost accounting standards and

regulations to which it would be subjected. *See id.* § 103, Sec. 719(a).

25.     The 1970 DPA Amendment also included a guarantee that, prior to the

implementation of any "rules, regulations, cost-accounting standards, and modifications thereof,"

the defense industrial base and other interested parties would be provided the opportunity,

through a period for public notice and comment, "to submit their views and comments with

respect to the action proposed to be taken." *Id.* §103, Sec. 719(h)(3)(i)(A). Only then, "[a]fter full consideration of the views and comments so submitted," would the original CAS Board be permitted to promulgate "rules, regulations, cost-accounting standards, and modifications thereof . . . ." *Id.*

### The Cost Accounting Standards Clause and Unilateral Changes

26.     As required by the 1970 DPA Amendment, the original CAS Board promulgated cost accounting standards and regulations applicable to the defense industrial base, including 4 C.F.R. § 331.50, which came to be known as the "Cost Accounting Standards Clause." An identical clause was published in the Armed Services Procurement Regulations ("ASPR") and the Defense Acquisition Regulation ("DAR"), the predecessors to today's FAR, in order to be incorporated into CAS-covered contracts with defense contractors.

27.     The Cost Accounting Standards Clause instructed a contractor, "[b]y submission of a Disclosure Statement," to "disclose in writing his cost accounting practices as required by regulations of the Cost Accounting Standards Board." 4 C.F.R. § 331.50(a)(1) (1974). Of moment here, the Cost Accounting Standards Clause also directed a process by which a contractor, having effected a change in its cost accounting practices, may be required to agree to an equitable adjustment of the price of CAS-covered contracts. *See id.* § 331.50(a)(2), (a)(4)(B).

28.     As noted above, the term "equitable adjustment" generally refers to the legal concept of returning contracting parties to the same relative positions they occupied before implementing the change, subject to any governing statutory restrictions. To compute an equitable adjustment for an accounting change, one applies the new accounting practice to the CAS-covered contracts as if it had been in use since the inception of the contracts, and then compares the resulting cost with the cost of the contracts under the original practices.

29.     The type of change effected by a contractor determines the nature of the equitable adjustment to be made to its affected contracts. Unilateral changes—i.e., changes made voluntarily by a CAS-covered contractor—are the type at issue here. The 1970 DPA Amendment permitted unilateral changes, so long as an equitable adjustment protected the Government from paying any increased costs caused by the changes. Specifically, the 1970 DPA Amendment stated as follows:

> Such regulations [to be promulgated by the original CAS Board] shall require defense contractors and subcontractors . . . to agree to a contract price adjustment, with interest, for any increased costs paid to the defense contractor by the United States because of the defense contractor's failure . . . to follow consistently his disclosed cost-accounting practices in pricing contract proposals and in accumulating and reporting contract performance data.

1970 DPA Amendment, § 103, Sec. 719(h)(1).

30.     Accordingly, when the original CAS Board promulgated the Cost Accounting Standards Clause, it permitted an equitable adjustment and proscribed only the payment of "increased costs" by the Government. Its Cost Accounting Standards Clause stated as follows:

> (2) . . . If any change in disclosed practices is made for purposes of any contract or subcontract subject to Cost Accounting Standards Board requirements, the change must be applied prospectively to this contract, and the Disclosure Statement must be amended accordingly. If the contract price or cost allowance of this contract is affected by such changes, adjustment shall be made in accordance with subparagraph (a)(4) or (a)(5) below, as appropriate.
>
> . . . .
>
> (4)(B) Negotiate with the contracting officer to determine the terms and conditions under which a change to either a disclosed cost accounting practice or an established cost accounting practice . . . may be made. A change to a practice may be proposed by either the Government or the contractor, provided, however, that no agreement may be made under this provision that will increase costs paid by the United States.

4 C.F.R. § 331.50(a)(2), (a)(4)(B) (1974).

## Simultaneous Unilateral Changes

31.     Although Congress did not use the words "change" or "changes" in the 1970 DPA

Amendment, that is not because the concept of making multiple changes—or even making

multiple changes simultaneously—was unknown to Congress or to the original CAS Board.

During a 1970 hearing, Congress heard testimony that "[a]ppropriate *changes* in accounting

practices needed because of significant changes in a contractor's operations could be recognized

by a change in the contract and appropriate adjustment in price if warranted." *Extension of the*

*Defense Production Act and Uniform Cost Accounting Standards: Hearings on S. 3302 Before*

*the Subcomm. on Production & Stabilization of the S. Comm. on Banking & Currency*, 91st

Cong. 13 (1970) (emphasis added). And in 1974, in promulgating its first cost accounting

standard, the original CAS Board stated: "*[C]hanges* in established cost accounting practices

during contract performance may be made when authorized by standards, rules, and regulations

issued by the Cost Accounting Standards Board." 4 C.F.R. § 401.50(b) (1974) (emphasis added).

Known today as CAS 401, this cost accounting standard still uses the plural: "*[C]hanges* in

established cost accounting practices during contract performance may be made in accordance

with part 99." 48 C.F.R. § 9904.401-50(b) (emphasis added).

32.     Historically, under these provisions, whenever a defense contractor made multiple

unilateral, simultaneous changes in cost accounting practices, the equitable adjustment

negotiated by the Government and the contractor would be based on the net economic impact of

those changes. If the sum of cost "decreases" would exceed or equal the sum of cost "increases,"

then no contract price adjustments would be required. Conversely, to the extent that increases

would exceed decreases, those amounts would be reflected in contract price adjustments. This

convention, commonly referred to as "offsetting," ensured that "no agreement" would "increase costs paid by the United States," thus complying with the 1970 DPA Amendment and the Cost Accounting Standards Clause.

33.     In 1976, the Department of Defense established a "CAS Working Group," whose purpose was to develop interim procedures and policy guidance useful to integrating CAS promulgations into procurement practices. In "Working Group Item 76-8," the CAS Working Group prescribed the use of offsetting, as follows: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." CAS Working Group, Guidance Paper No. WG 76-8, Interim Guidance on Use of the Offset Principle in Contract Price Adjustments Resulting from Accounting Changes at VI-16 (Dec. 17, 1976).

34.     In 1980, Congress terminated all appropriations for the original CAS Board, and the original CAS Board disbanded. However, the 1970 DPA Amendment was not repealed, and the original CAS Board's regulations and standards remained the law.

35.     In July 1986, the Defense Contract Audit Agency ("DCAA") published its approval of offsetting in the DCAA Contract Audit Manual, which stated as follows: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(3) (1986).

36.     In December 1987, when the DCAA re-issued its Contract Audit Manual, it included the same instruction: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(3) (1987).

**The CAS Statute**

37.     Today's reconstituted CAS Board dates to the Office of Federal Procurement Policy Amendments Act of 1988, known as the "CAS Statute." *See* Pub. L. No. 100-679, § 5, 102 Stat. 4055 (1988). Until January 2011, the CAS Statute was codified at 41 U.S.C. § 422. It now resides at 41 U.S.C. §§ 1501–06. Citations in this Complaint are to the current statute.

38.     The CAS Statute continues prior practice of requiring that the defense industrial base have a voice in the development and implementation of cost accounting standards and regulations. The CAS Board is an independent, five-member board in the Office of Federal Procurement Policy ("OFPP"). *See* 41 U.S.C. § 1501(b)(1). One member, the Chairman, is the Administrator of the OFPP. *Id.* Two members represent the Government. *Id.* § 1501(b)(1)(A). But two members must be from the private sector, including "one [who] is a representative of industry" and "one [who] is particularly knowledgeable about cost accounting problems and systems." *Id.* § 1501(b)(1)(B). In addition, Congress again imposed special procedural requirements that the CAS Board must follow before promulgating a regulation, such as consulting with interested parties. *Id.* § 1502(c).

39.     The legislative history of the CAS Statute affirms that Congress deliberately constituted the Board with "broad industry participation." *To Extend the Authorization of Appropriations for the Office of Federal Procurement Policy: Hearing on H.R. 2539 Before a Subcomm. of the H. Comm. on Gov't Operations*, 100th Cong. 73 (1987) (Statement of A.G.W. Biddle, Administrator, Office of Fed. Procurement Pol'y). Congress intended to secure the CAS Board's independence and to "insulate the responsibility for establishing, interpreting and updating the Standards from the influences associated with the procurement process." *Reauthorization of the Office of Federal Procurement Policy: Hearing Before the S. Subcomm.*

*on Fed. Spending, Budget, & Accounting of the Comm. on Gov't Affairs*, 110th Cong. 224 (1988)

(statement by Procurement Round Table); *see also id.* at 33 (statement of Clarence T. Kipps, Jr.,

U.S. Chamber of Commerce). In these ways, the CAS Board is unlike the FAR Council, which is

composed exclusively of representatives from the Government, *see* 41 U.S.C. § 1302(b)(1), and

whose rulemaking actions are subject to fewer procedural safeguards, *see id.* § 1303(a)(1).

40.      The CAS Statute granted to the CAS Board certain plenary powers in even clearer

terms than the 1970 DPA Amendment. As set forth in Section 1502: "The Cost Accounting

Standards Board has exclusive authority to prescribe, amend, and rescind cost accounting

standards, and interpretations of the standards, designed to achieve uniformity and consistency in

the cost accounting standards governing measurement, assignment, and allocation of costs to

contracts with the Federal Government." 41 U.S.C. § 1502(a)(1). Further emphasizing the CAS

Board's exclusive authority over these standards, the statute provides that "[c]osts that are the

subject of cost accounting standards" shall not be "subject to regulations established by another

executive agency that differ from those standards with respect to the measurement, assignment,

and allocation of costs." *Id.* § 1504(c). The CAS Statute also directs the Board to "prescribe

regulations for the implementation of cost accounting standards prescribed or interpreted under

this section." *Id.* § 1502(f).

41.      Like the 1970 DPA Amendment, the CAS Statute permits unilateral changes in a

contractor's cost accounting practices, so long as an equitable adjustment protects the

Government from paying any increased costs caused by the changes. In Section 1502, the CAS

Statute states as follows:

> The regulations [prescribed by the CAS Board] shall be
> incorporated into the Federal Acquisition Regulation and shall
> require contractors and subcontractors as a condition of contracting
> with the Federal Government to . . . agree to a contract price

> adjustment, with interest, for any increased costs paid to the contractor or subcontractor by the Federal Government because of a change in the contractor's or subcontractor's cost accounting practices . . . .

*Id.* § 1502(f).

42.     Section 1503 of the CAS Statute clarifies the scope of the equitable adjustment required by Section 1502, by providing that such an adjustment depends on the effect of changes made "in the aggregate." Section 1503 states as follows:

> A contract price adjustment undertaken under section 1502(f)(2) of this title shall be made, where applicable, on relevant contracts between the Federal Government and the contractor that are subject to the cost accounting standards *so as to protect the Federal Government from payment, in the aggregate, of increased costs,* as defined by the Cost Accounting Standards Board. *The Federal Government may not recover costs greater than the aggregate increased cost to the Federal Government*, as defined by the Board, on the relevant contracts subject to the price adjustment unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Federal Government.

*Id.* § 1503(b) (emphasis added).

43.     Central to this discussion, this statutory language expressly grants to the CAS Board the authority to define "payment, in the aggregate, of increased costs," and "aggregate increased cost to the Federal Government." *Id.* In addition, the CAS Statute makes clear that the equitable adjustment need only protect the Government "from payment, in the aggregate, of increased costs." *Id.* And, subject to an exception not applicable here, the CAS Statute expressly prohibits the Federal Government from recovering "greater than the aggregate increased cost to the Federal Government." *Id.*

44.     In the event that the Government and a contractor cannot agree on the appropriate measure of a price adjustment, the disagreement constitutes a dispute under the Contract Disputes Act. *Id.* § 1503(a).

45.     The Government has recognized, more than once, that the CAS Board has plenary authority to interpret the phrase "increased costs, in the aggregate." In one instance, a lawyer representing the DCMA submitted a memorandum to the Chair of the DAR Committee on Cost Accounting Standards, which was in response to a request for advice about "[w]hether the DAR or FAR Council (Councils) can issue regulations explaining the phrase 'increased costs (as defined by the Board) in the aggregate.'" Memorandum from Lawrence Rabyne, Attorney, DCMA, to Tricia Kobus, Chair, DAR Comm. on Accounting Standards (Feb 19, 2004). The lawyer opined the position of the DCMA that "the Councils may not issue *binding* regulations regarding the phrase 'increased costs, in the aggregate.'" *Id.* (emphasis in original). The DCMA had also concluded that the CAS Statute bars the CAS Board from delegating its authority to any executive agency, even to the FAR Council, which is the Government body responsible for maintaining the FAR. Although the FAR Council is permitted to issue regulations for the "implementation" of cost accounting standards, "[t]hese regulations must be consistent with [cost accounting standards] and may not serve as an interpretation of the existing [cost accounting standards] regulation. Regulations promulgated by the [FAR Council] should be procedural rather than substantive in nature." *Id.*

46.     The CAS Board has implemented the CAS Statute through the Cost Accounting Standards Clause, which today can be found at 48 C.F.R. § 9903.201-4. Much like the original Cost Accounting Standards Clause, today's Clause prohibits the payment of "increased costs" by the Government:

18

(2) . . . If any change in cost accounting practices is made for the purposes of any contract or subcontract subject to CAS requirements, the change must be applied prospectively to this contract, and the Disclosure Statement . . . must be amended accordingly. If the contract price or cost allowance of this contract is affected by such changes, adjustment shall be made in accordance with subparagraph (a)(4) or (a)(5) below, as appropriate.

. . . .

(4)(ii) Negotiate with the Contracting Officer to determine the terms and conditions under which a change may be made to a cost accounting practice. . . provided that no agreement may be made under this provision that will increase costs paid by the United States.

(4)(iii) When the parties agree to a change to a cost accounting practice, . . . negotiate an equitable adjustment as provided in the Changes clause of this contract.

48 C.F.R. § 9903.201-4(a).

47. An identical version of the Cost Accounting Standards Clause has been implemented by the FAR Council in the FAR, and it is incorporated into CAS-covered contracts with defense contractors. *See* FAR 52.230-2; *see also* FAR 30.201-4(a).

**Continued Acceptance of Offsetting**

48. In 1990, the Defense Contract Management Command ("DCMC")—the predecessor to today's DCMA—recognized and endorsed offsetting. Writing in its Contract Administration Manual, the DCMC acknowledged that the CAS Statute had expressly authorized the practice of offsetting. *See* DCMC, Contract Administration Manual at § 30-2(f) (1990) ("Major provisions of the new legislation are . . . (iii) Offsets allowed on relevant contracts subject to the price adjustment . . . ."). And the DCMC directed that, "[w]ithin a segment, several accounting changes may be combined for offset purposes as long as they have the same effective date." *Id.* § 30-12(c)(4).

49.     In July 1999, when the DCAA re-issued its Contract Audit Manual, it again stated: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(c) (1999).

50.     In April 2000, the FAR Council, acknowledging the practice of offsetting, proposed an amendment to the FAR. In a proposed rule, the FAR Council proposed amending FAR 30.606 to state: "Within a segment, the [Cognizant Federal agency official ("CFAO")] may combine the effect of several changes in accounting practice in the offset consideration if the changes have the same effective date." Federal Acquisition Regulation, 65 Fed. Reg. 20,854, 20,859 (Apr. 18, 2000) (proposed rule). The purpose of the amendment, according to the FAR Council, was merely to clarify the procedures and processes to be followed by the Government when making equitable adjustments. *Id.*

51.     In June 2000, the CAS Board encouraged the FAR Council to finalize the proposed rule. *See* Changes in Cost Accounting Practices, 65 Fed. Reg. 37,470 (June 14, 2000) (final rule) ("The Board encourages the Councils to finalize the proposed rulemaking."). The CAS Board had been considering whether to promulgate a comparable amendment to its regulations. *See* Changes in Cost Accounting Practices, 64 Fed. Reg. 45,700, 45,731 (Aug. 20, 1999) (supplemental notice of proposed rulemaking); Changes in Cost Accounting Practices, 62 Fed. Reg. 37,654, 37,684 (July 14, 1997) (supplemental notice of proposed rulemaking); Changes in Cost Accounting Practices, 61 Fed. Reg. 49,196, 49,219 (Sept. 18, 1996) (notice of proposed rulemaking). But the CAS Board had concluded that its own amendment would be unnecessary, on account of the "expected issuance" of a final rule implementing the April 2000 proposal by the FAR Council. *See* 65 Fed. Reg. at 37,470, 37,471.

52.    In July 2002, when the DCAA re-issued its Contract Audit Manual, it again stated: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(a)(3) (2002).

53.    In July 2002, when the Defense Acquisition University delivered a training program to the DCMA, it went so far as to instruct government personnel to offset all unilateral changes executed *in the same fiscal year*, not just on the same effective date. *See* DCMA, Cost Accounting Standards Workshop: Accounting Changes and Cost Impact Statements at 33 (July 24-25, 2002) ("Combine cost impact of [contractor accounting practice] Changes Within Segment Only If Implemented Within Same FY.").

54.    By December 2002, even the FAR Council had acknowledged that the convention of offsetting could be used for all unilateral changes executed *in the same fiscal year*, not just on the same effective date. The FAR Council resumed the draft rulemaking action that it already had initiated, as noted above, in April 2000. But rather than finalizing that proposed rule, the FAR Council endorsed a change. The FAR Council revised the proposed rule to embrace "combin[ing] the cost impacts of several changes . . . if the changes are implemented in the same fiscal year." (The FAR Council had begun using the term "combine," not "offset.") The Administrator of the OFPP approved of the change.

55.    In July 2003, the FAR Council published its revised proposed rule for public notice and comment. The rule proposed by the FAR Council in July 2003 embraced offsetting (or "combining") "the cost impacts of several changes . . . if the changes are implemented in the same fiscal year." *See* Cost Accounting Standards Administration, 68 Fed. Reg. 40,104, 40,111 (July 3, 2003) (proposed rule).

56.     In July 2003, when the DCAA re-issued its Contract Audit Manual, it again stated: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(a)(3) (2003).

57.     On August 5, 2003, the Director of Defense Procurement, Department of Defense, convened a public meeting in Arlington, Virginia, for the purpose of "providing the public with insight into the content and rationale" of the revised proposed rule that the FAR Council had published in July 2003. Attendees were advised, consistent with the July 2003 proposed rule, that FAR 30.606 would be amended to formally recognize the convention of offsetting (or "combining") cost impacts "if the changes [in cost accounting practices] are implemented in the same fiscal year."

58.     In January 2004, when the DCAA re-issued its Contract Audit Manual, it again stated: "Within a segment, the effect of several changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.5(a)(3) (2004).

59.     In January 2005, when the DCAA re-issued its Contract Audit Manual, it once again stated: "Within a segment, the effect of several accounting practice changes may be combined in the offset consideration if the changes all take place at the same time." DCAA, Contract Audit Manual § 8-503.3(b) (2005).

**A Complete Reversal by the FAR Council**

60.     In March 2005, the FAR Council promulgated a final rule. *See* Federal Acquisition Regulation, 70 Fed. Reg. 11,743, 11,758 (Mar. 9, 2005) (final rule).

61.     Deviating from longstanding practice and the FAR Council's proposed rules, the final rule amended FAR 30.606 by *prohibiting* the practice of offsetting. *Id.* As amended,

FAR 30.606(a)(3) now states, as follows: "In resolving the cost impact, the CFAO . . . (ii) [s]hall *not* combine the cost impacts of any of the following unless all of the cost impacts are increased costs to Government: (A) [o]ne or more unilateral changes." 70 Fed. Reg. at 11,758 (emphasis added); *see also id*. at 11,750 ("Never combine, unless all have increased costs, one or more unilateral changes . . . .").

62.     This complete reversal by the FAR Council occurred without notice to the public. In the public comments accompanying the final rule, the FAR Council declared for the first time, *sua sponte*, that "[t]here is no statutory provision that permits offsetting the cost-impact of one unilateral change/noncompliance with the cost-impact of any other unilateral change/noncompliance." 70 Fed. Reg. at 11,749. The Government provided no explanation for its abrupt change in position other than this conclusory, unsupported assertion.

63.     "Agencies are free to change their existing policies," but bedrock principles of administrative law require that when they do so, they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). At a minimum, the agency "must . . . display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. at 2126 (quotation marks omitted).

64.     Moreover, under 41 U.S.C. § 1707, the FAR Council may promulgate "a procurement policy [or] regulation" only if it first publishes notice of the proposed rulemaking in the Federal Register and gives the public a period of at least 60 days to submit comments on the proposal. And "[a]lthough the notice" required by the procedure for public notice and comment "need not specify every precise proposal which the agency may ultimately adopt, it must be sufficient to fairly apprise interested parties of the issues involved." *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (brackets and quotation marks omitted).

**Impact on Boeing**

65.      On January 1, 2011, Fixed Wing implemented a number of simultaneous, unilateral changes in its cost accounting practices. Those changes affected the costs allocated to CAS-covered contracts, including the representative contract at issue here, No. N00019-09-C-0019.[1] Between the end of 2010, when Boeing first disclosed its proposed 2011 accounting changes to the Government, and the end of 2016, Boeing and the Government worked to determine which of Boeing's changes impacted costs in a way that might require an equitable adjustment and what the amount of that impact was.

66.      Most of Fixed Wing's accounting practice changes eliminated or consolidated bulk labor accounting pools. Employees charge their time to a bulk labor accounting pool when charging discretely to specific activities, contracts, or work units would be ineffective, inefficient, or inaccurate. The time entered into the bulk labor pool is then allocated across a "base," or a set of specific activities or contracts to which the bulk labor is related. The following example illustrates how this process works:

> Supervisor Smith charged 40 hours to a bulk account used to collect supervisory time spent overseeing aircraft assembly. Three employees (Bob, Jan, and Ted) worked on assembling aircraft. Employee Bob charged 15 hours to activity code A (which designates the particular aircraft or contract he was working on), Employee Jan charged 25 hours to activity code B, and employee Ted charged 10 hours to activity code C.
>
> The supervisor bulk pool is comprised of Supervisor Smith's time. The total base is comprised of the sum of the employees' time.

---

[1] FAR 30.606(a)(2) provides that where a cost accounting practice change increases cost on multiple government contracts, the Government "may resolve [the] cost impact . . . by adjusting a single contract," rather than "all contracts" affected by the change. Pursuant to this provision, the Government selected Contract No. N00019-09-C-0019 as a representative contract affected by the changes.

Total Pool = 40 hours        Total Base = 50 hours

Supervisor Smith's time is allocated across the base—the activities
he supervised—and charged to each of the activity codes in the
base in proportion to the underlying work he supervised, such that
every hour discretely charged by Bob, Jan, and Ted would be
allocated 0.8 additional hours (40 hours/50 hours = 0.8 hours):

Activity Code A = 15 hours multiplied by 0.8 = 12 hours from
pool

Activity Code B = 25 hours multiplied by 0.8 = 20 hours from pool

Activity Code C = 10 hours multiplied by 0.8 = 8 hours from pool

67.    Although the use of bulk charging is often necessary, charging discretely to a

specific activity, contract, or work unit is generally preferable when possible because it more

precisely captures the relationship between each cost and the activity or contract for which it was

incurred. Charging discretely also reduces the administrative resources required to allocate the

bulk labor costs. Indeed, it is not unusual for time in a bulk labor pool to be allocated among

thousands of activity codes and departments. As a result, even a handful of charges to a bulk

labor pool can spawn thousands of additional records.

68.    As noted above, the 2011 Fixed Wing accounting changes primarily involved the

elimination or consolidation of bulk labor accounting pools. Eight of those changes were deemed

unilateral changes within the meaning of 48 C.F.R. § 9903.201-6. Of those changes, two led to

an increased allocation of cost to the affected contracts, and two led to a decreased allocation of

costs. Four either had no impact or had an impact that was included under another change.

69.    Three of the four changes that affected costs, change 4 (GT-2011-04), change 5

(GT-2011-05), and change 6 (GT-2011-06), resulted from the adoption of a new shipping

system, the Boeing Electronic Shipping System ("BESSy"). Boeing's primary purpose in

adopting BESSy was to improve its shipping capabilities, and the new system enabled Boeing to

improve several of its accounting practices. Specifically, BESSy permitted Boeing to either eliminate or consolidate several bulk labor accounting pools.

70.     Change 4 resulted from BESSy's capability to track shipped materials to a precise location for each aircraft, which enabled employees who managed shipping, packing, and crating to charge their time discretely. Accordingly, Boeing's accounting department eliminated the shipping, packaging, and crating bulk labor pools.

71.     Change 5 is directly related to change 4. Before the implementation of BESSy, while the shipping, packaging and crating supervisors charged their time to one bulk labor pool, the clerical personnel that supported the shipping, packaging, and crating employees charged their time to a separate clerical bulk pool. Those costs were then allocated based on the quantity of shipping forms generated by the shipping, packaging, and crating personnel. The implementation of discrete charging (change 4) allowed Boeing to allocate the clerical support by direct labor hours as opposed to quantity of shipping forms, effectively consolidating two bulk labor pools into one.

72.     Change 6, like change 5, consolidated two bulk labor pools as a result of the discrete charging enabled by BESSy. Prior to this change, personnel involved with production control spares (shipping and packaging spare parts) charged their time to a bulk labor pool that distributed costs based on the weight of shipments. The change to discrete charging for shipping, packaging, and crating allowed Boeing to allocate production control spare costs to direct labor hours as opposed to shipment weights. Separately, foreman aircraft support personnel charged their time to another bulk pool. Boeing consolidated the production control spares and shop foremen aircraft support bulk labor pools because they had a connection to the same shipped material and shared the same base.

73.     As depicted in the graphic below, before Changes 4, 5 and 6, Boeing's accounting

structure had many different bulk labor pools related to shipping, packaging, and crating that

allocated costs in a variety of ways (weight, hours, number of shipments processed). After these

changes, Boeing charged certain costs discretely, and consolidated the related costs into three

bulk labor pools, each of which was allocated to direct labor hours. Thus, these changes

simplified Boeing's accounting structure and eliminated thousands of accounting records.

Moreover, these changes led to more accurate charges by eliminating multiple levels of bulk

labor pools and more precisely capturing the relationship between the costs incurred and the

ultimate contracts or aircraft those costs benefited.

*Before* **Changes 4, 5, and 6:**



**After Changes 4, 5, and 6:**



74.    Change 7 (GT-2011-07)[2] resulted from improvements in Boeing's manufacturing process for the F-15 aircraft. Boeing reorganized and consolidated manufacturing processes and adjusted its accounting structure to align with these manufacturing changes. Boeing redistributed costs and consolidated multiple bulk labor pools as a result.

75.    According to Boeing's calculations, two of these changes—change 6 (GT-2011-06) and change 7 (GT-2011-07)—would result in a net increased cost impact of $888,000 on its Fixed Wing contracts with the Government (before Boeing's profit is factored in). However, this increased cost impact was more than offset by the estimated cost *savings* resulting from the remaining changes (about $2,284,000, again before Boeing's profit on the contracts is accounted for). The net effect of the eight simultaneous changes was to save the Government a total of $1,396,000, across all affected contracts—or $1,489,000, once Boeing's profit is accounted for.

---

[2] The cost impact of changes GT-2011-02 and GT-2011-08 could not be calculated in isolation from GT-2011-07, so any cost impact from those changes was included in the estimate for GT-2011-07.

To repeat: The changes that Fixed Wing implemented simultaneously on January 1, 2011, saved the Government nearly $1.5 million in the aggregate.

### The Contracting Officer's Final Decisions

76.    On December 21, 2016, on behalf of the Government, the Contracting Officer issued the 2016 COFD. *See* Exhibit 2. Even though the Government agreed that six changes were either cost neutral or cost saving, the Government still demanded that Boeing submit payment to cover the increased costs caused by two of the changes, GT-2011-06 and GT-2011-07, viewed in isolation. The Contracting Officer found that, once Boeing's profit was included, change GT-2011-06 resulted in increased costs of $188,146, and change GT-2011-07 resulted in increased costs of $751,861—in sum, $940,007. *Id.* at 2. The Government refused to offset those increased costs with the nearly $2,284,000 (before profit) in simultaneous cost savings; instead, it demanded that Boeing pay it the $940,007—in effect, pocketing the almost $1.5 million in net cost savings, but demanding an additional windfall of $940,007.[3] The Government also demanded $124,766 in compound interest, for a total demand of $1,064,773, on top of the $1.5 million in net cost savings.

77.    Boeing entered into an installment agreement with the Government to cover the payment of the $1,064,773 demanded in the 2016 COFD, while reserving its right to continue to dispute the Government's entitlement to that payment. Pursuant to this installment agreement, Boeing has paid $71,276 to the Government as of December 18, 2017, and it must make a further payment of $8,900 at the beginning of each subsequent month.

---

[3] As noted in Paragraph 75, Boeing had reported the cost impact of its simultaneous changes to the Government *without* including profit: $888,000 in increased costs, plus $2,284,000 in decreased costs, resulting in $1,396,000 in net cost savings to the Government (or $1,489,000, once Boeing's profit is added). The 2016 COFD, which demands payment for $940,007 in increased costs (viewed in isolation), *includes* profit.

78.     On September 25, 2017, Boeing submitted a certified claim to the Contracting

Officer, alleging that the Government's refusal to apply the offsetting principal violates 41

U.S.C. § 1503. Boeing also contended that FAR 30.606's bar on offsetting is invalid because:

(a) it was adopted without authority by the FAR Council; (b) it is designed to grant the

Government a financial windfall under contracts to which it is a party; (c) the FAR Council, in

adopting it, wholly failed to explain or justify its course reversal from the Government's

previous, longstanding application of offsetting; and (d) the unexplained, last-minute course

reversal by the FAR Council failed to provide the public adequate notice and an opportunity to

comment on the new policy. Boeing further maintained that the 2016 COFD's demand for

$1,064,773 violates Section 1503 of the CAS Statute and breaches the Government's contracts

with Fixed Wing. Boeing also contended in the alternative that the demand constitutes an illegal

exaction.

79.     On November 21, 2017, the Contracting Officer issued the 2017 COFD, denying

Boeing's certified claim. *See* Exhibit 1. The Government construed the bulk of Boeing's claim as

merely a request for reconsideration of the 2016 COFD, and it refused to reconsider that earlier

decision. *Id.* at 1–2. The only part of Boeing's claim that was new, according to the Government,

was the request for reformation of the affected contracts. *Id.* at 2. It rejected that request on the

merits, reasoning that there is no "clause of the contract" that it could reform to comply with the

CAS Statute's directive that the cost impacts of simultaneous changes be offset, and in any case,

"there is no such 'directive' in the statute." *Id.*

80.     The 2017 COFD constitutes a "Final Decision" within the meaning of 41 U.S.C.

§ 7103 because it is a written statement denying Boeing's claim, even though the Contracting

Officer purported to frame the 2017 COFD as *not* constituting a final decision. *See CW Gov't*

*Travel, Inc. v. United States*, 63 Fed. Cl. 369, 384-85 (2004). In the alternative, because more than sixty days have now passed since the submission of Boeing's claim, the Government is now deemed to have denied the claim pursuant Section 7103(f).

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Express Contract

81.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

82.     Boeing is party to multiple express, CAS-covered contracts with the United States, executed between 1992 and 2015, including the subject contract, No. N00019-09-C-0019.

83.     In accordance with 48 C.F.R. § 9903.201-4, each of the contracts at issue contain a clause requiring Boeing to "negotiate an equitable adjustment" when it makes a unilateral "change to a cost accounting practice."

84.     These clauses implement 41 U.S.C. § 1502(f), which requires that contractors, "as a condition of contracting with the Federal Government," must "agree to a contract price adjustment," when they change their practices.

85.     These clauses must be interpreted in accordance with 41 U.S.C. § 1503(b), which mandates that the amount of such an adjustment must "protect the Federal Government from payment, in the aggregate, of increased costs, as defined by the Cost Accounting Standards Board," but that the Government "may not recover costs greater than the aggregate increased cost to the Federal Government, as defined by the Board, on the relevant contracts subject to the price adjustment."

86.     Boeing's contracts with the Government thus impose upon the Government a duty not to demand a price adjustment that results in its "recover[ing] costs greater than the aggregate increased cost to the Federal Government . . . on the relevant contracts."

87.    On January 1, 2011, Fixed Wing implemented eight unilateral changes in its cost accounting practices. While two of those changes increased costs allocated to the Government on contracts governed by the CAS, that increase was more than offset by the cost savings yielded by the other six changes, such that the aggregate effect of all eight changes was to save the Government money.

88.    Nonetheless, in its 2016 COFD, the Government demanded from Boeing a price adjustment of $1,064,773—the cost impact caused by two of Fixed Wing's accounting changes considered in isolation. The Government refused to withdraw that demand in its 2017 COFD.

89.    The Government justified its refusal to aggregate the cost impacts of all of the January 1, 2011 changes by citing FAR 30.606, which purports to bar the practice of offsetting, but that provision is inconsistent with Section 1503(b). It is also invalid because the FAR Council had no authority to define the "aggregate increased costs" that the Statute authorizes the Government to recover, 41 U.S.C. § 1503(b), nor to promulgate the standards and rules necessary to obtain "uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the Federal Government," 41 U.S.C. § 1502(a)(1). Moreover, the revision to FAR 30.606 was adopted without adequate notice and comment, and without explanation for the abrupt reversal of longstanding government policy to the contrary.

90.    The Government's demand accordingly violates the Government's agreement, under its contracts with Boeing, to refrain from demanding a price adjustment greater than the aggregate increased costs arising from the accounting changes.

91.    The United States' breach of each of its relevant contracts with Boeing has directly caused Boeing substantial damages, by requiring Boeing to make $71,276 in payments,

to date, pursuant to the 2016 COFD, plus subsequent payments at the beginning of each month in the amount of $8,900.

## COUNT II

### Declaratory Judgment

92.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

93.     Boeing is entitled to a declaratory judgment that its CAS-covered contracts with the Government, including the subject contract, No. N00019-09-C-0019, require the Government to offset the cost impacts of simultaneous unilateral changes in cost accounting practices in determining the applicability and amount of any equitable adjustment arising from such changes.

94.     A declaratory judgment clarifying the Government's duties under its contracts with Boeing is necessary and appropriate because there is a live dispute between the parties as to whether the cost impacts of simultaneous unilateral changes in cost accounting practices must be offset.

95.     A declaratory judgment clarifying the Government's obligation under its contracts with Boeing to offset the cost impacts of simultaneous unilateral changes would conclusively resolve this dispute.

96.     Absent declaratory relief, the Government will continue to violate those duties each time in the future that Boeing makes simultaneous unilateral changes in cost accounting practices that affect the contracts in question, and forward-looking declaratory relief is a more efficient way of resolving this continuing dispute between the parties than forcing Boeing to continue to suffer each of these repeated harms and then to seek damages.

## COUNT III

### Reformation of Contract

97.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

98.     Section 1503 forbids the Government from demanding a price adjustment that would lead it to "recover costs greater than the aggregate increased cost to the Federal Government . . . on the relevant contracts." Refusing to offset the cost impacts of simultaneous unilateral changes in cost accounting practices violates this requirement.

99.     Because it prevents the Government from receiving a windfall on its contracts, Section 1503 was enacted for the benefit of private contractors.

100.    To the extent Boeing's CAS-covered contracts with the Government are interpreted not to require the Government to offset the cost impacts of simultaneous unilateral changes in cost accounting practices, they are in violation of 41 U.S.C. § 1503(b), and Boeing is entitled to reformation of its contracts with the Government to provide that the cost impacts of simultaneous unilateral changes in cost accounting practices must be offset.

## COUNT IV

## Illegal Exaction

101.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

102.    The Government's demand for payment of $1,064,773 is based on its refusal to offset the cost impact of the simultaneous unilateral changes made by the Fixed Wing ABU in its cost accounting practices on January 1, 2011, in direct violation of 41 U.S.C. § 1503(b), which requires that the Government "may not recover costs greater than the aggregate increased cost to the Federal Government."

103.    The Government justified its refusal to aggregate the cost impacts of the January 1, 2011 changes by citing the FAR Council's 2005 revision to FAR 30.606, but that revision was implemented by the FAR Council without authority in violation of the delegations of authority to the CAS Board set forth in 41 U.S.C. §§ 1503(b) and 1502(a), and without adequate notice and comment, in violation of 41 U.S.C. § 1707.

104.     Accordingly, even to the extent this Court concludes that Boeing has no remedy in contract for the Government's demand that Boeing pay $1,064,773 in violation of 41 U.S.C. §§ 1503(b), 1502(a), and 1707, that demand constitutes an illegal exaction of money from Boeing. Boeing therefore is entitled to relief under the Fifth Amendment to the United States Constitution. Boeing is entitled to damages sufficient to compensate it for the $71,276 in payments it has made to date pursuant to the 2016 COFD, plus the amount of each subsequent monthly payment of $8,900 that Boeing makes until this dispute is resolved, plus the interest that accrues on this claim until the date of payment by the Government under 41 U.S.C. § 7109.

**PRAYER FOR RELIEF**

105.     WHEREFORE, Plaintiff prays for an order and judgment:

a.     Awarding Boeing damages sufficient to compensate it for the $71,276 in payments it has made to date pursuant to the 2016 COFD, plus the amount of each subsequent monthly payment of $8,900 that Boeing makes until this dispute is resolved, plus the interest that accrues on this claim until the date of payment by the Government under 41 U.S.C. § 7109;

b.     Declaring that the clauses incorporated in each of the relevant contracts between Boeing and the United States pursuant to 48 C.F.R. § 9903.201-4 must be interpreted consistently with 41 U.S.C. § 1503(b), which requires that the Government "may not recover costs greater than the aggregate increased cost to the Federal Government" caused by simultaneous unilateral changes in cost accounting practices, and that this imposes a duty upon the Government to offset the cost impacts of such changes;

c.     In the alternative, reforming each of the relevant contracts between Boeing and the United States to construe them consistently with the requirement in 41 U.S.C. § 1503(b) that the Government "may not recover costs greater than the aggregate

increased cost to the Federal Government" caused by simultaneous unilateral changes in cost accounting practices, and to thus impose a duty upon the Government to offset the cost impacts of such changes;

> d.    Awarding Boeing its reasonable costs, including attorneys' fees, incurred in bringing this action; and

> e.    Granting such other and further relief as this Court deems just and proper.


Dated: December 18, 2017                    Respectfully submitted,


*Of counsel*:                                s/ Charles J. Cooper
                                             Charles J. Cooper
Michael W. Kirk                              COOPER & KIRK, PLLC
Howard C. Nielson, Jr.                       1523 New Hampshire Avenue, N.W.
John D. Ohlendorf                            Washington, D.C. 20036
COOPER & KIRK, PLLC                          (202) 220-9600
1523 New Hampshire Avenue, N.W.              (202) 220-9601 (fax)
Washington, D.C. 20036                       ccooper@cooperkirk.com
(202) 220-9600
(202) 220-9601 (fax)

Seth H. Locke
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C. 20005
(202) 654-6267
(202) 654-9947 (fax)
slocke@perkinscoie.com